HUDSON *vs* ISBELL.

1. Parol proof is admissible to show, that a conveyance, absolute on its face, was intended by the parties, to operate as a mortgage or security.
2. The testimony of a subscribing witness to a conveyance, as to matters agreed upon by the parties, at the time of executing it, is not conclusive; and other witnesses may be introduced to show what conversation passed between the parties, at the time of executing the conveyance; and who may likewise have been present.
3. Where a bill in Chancery was filed, charging an absolute bill of sale of slaves, to have been intended as a mortgage, and there was a discrepancy in the testimony, as to whether the conveyance was, or not, intended as a mortgage—it was held, [under the circumstances,] that proof of the fact that the property was worth double the sum for which conveyed, should be regarded as evidence of the intention of the parties to hold the conveyance as a mortgage.
4. In such case it was held, that the delivery of the slaves, into the possession of the vendee, was not, [under the facts,] entitled to any consideration.
5. In such case, the vendor having admitted in his bill, that the vendee was to have the use of the slaves, in lieu of interest on the money paid; and having charged no usury—held, that the vendor was not entitled to hire, nor the vendee to interest, until from the time of an offer of the former to redeem.

Error, on a decree in Chancery, to the Circuit Court of Franklin.

Ellis Isbell filed his bill in Chancery, against Benjamin Hudson, alleging that on or about the fifth day of November, 1827, the defendant paid off, and discharged for the complainant, a certain judgment, then subsisting against him, in the Circuit Court of

Franklin, in favor of Davis & Gurley for the sum of five hundred and thirty dollars and ninety two and a half cents; that in order to secure and indemnify the said Hudson, for the payment so made, the complainant, on the — day of ——, 1827, placed, in the possession of Hudson, four slaves; all whom the defendant had retained in possession, and of whose services and labor he had secured the benefit, during a long period: that, by a verbal agreement between complainant and the defendant, the said slaves were to remain in the possession of Hudson, until the sum of money so paid by him, for the complainant, should be repaid by the latter; and if the complainant never did so, then said Hudson was to retain the said slaves, for the benefit of his family—Hudson's wife being a relative of the complainant. That, afterwards, in November, 1827, at the request of the defendant, and the better to secure him, in the advance so made, as aforesaid, the complainant executed a bill of sale of all said slaves, without any condition, other than a verbal agreement, that on the complainant's paying to the defendant, the amount advanced by him, as aforesaid, the complainant might redeem said slaves; which the defendant, then, and subsequently, agreed and assented to. That, on the sixth day of November, 1830, the complainant offered to pay off and discharge to the defendant, the amount of money advanced, and to redeem said slaves; but that the defendant refused to receive the same or suffer a redemption of the slaves.

The bill charged fraud, and prayed relief.

The answer of Hudson averred, that in October, 1827, the coronor of Franklin County being in pos-

session of a *fieri facias* against the property of the complainant, and the respondent, as his surety, in favor of Davis & Gurley, for above the sum of five hundred dollars; and the same having been levied on certain slaves of the complainant, including the four mentioned in his bill of complaint; and the complainant being unable to replevy the same, by reason of a previous forfeiture of his bond—the said slaves were lodged in the jail of Franklin County, of which the respondent was sheriff: that the complainant requested the respondent to discharge the slaves from custody, which he having refused to do, an agreement was subsequently entered into, between complainant and the respondent, by which it was agreed, that the complainant should execute a bill of sale to the respondent, of the four slaves in question, to save him harmless, in the event of the respondent being compelled to pay the execution aforesaid: that, in pursuance of this agreement, the slaves were released from jail, and the four mentioned in the bill of complaint, given into the possession of the respondent, in the presence of sundry witnesses; and that the intention of this act was, to save the respondent harmless, and to vest the slaves in him, absolutely, and not as a mortgage—in the event he, (the respondent,) was forced to pay off, and discharge the execution aforesaid; and which was to be paid by the fifth of November, of that year: and, that the complainant, then, positively agreed to, and with the respondent, that the said execution should be paid off and discharged by that period; and, on his failure to do so, then the respondent, on paying off the same, should hold the slaves, absolutely.—

That, on the fifth of November, ensuing, the complainant, having failed to settle the amount of the aforesaid execution, requested the respondent to pay off the same and take the slaves, as they, otherwise, would have to be sold; and the respondent had better have them, than another : that the respondent, accordingly paid off the said execution, amounting, at that time, to the sum of five hundred and sixteen dollars and sixty-two cents—beside costs. That, a few days after this transaction, and while the said slaves were yet in the possession of Isbell, he urged upon the respondent, that the latter would give to him the privilege of paying the money and interest, in one month; and of thus redeeming the slaves—all which was readily agreed to by the respondent : that at the end of the month, the complainant, having failed to pay the money, as before agreed upon, asked an extension of one month more, which was also agreed to : at the end of this second month, the complainant having again failed to settle the amount of money paid by the respondent, further extensions were allowed him, until the spring of 1828, when the respondent insisted on having the slaves given up, or a re-purchase of them had, which latter, the complainant expressed himself incapable of performing, by reason of the want of money. That the respondent then received the negroes, the complainat not objecting. That, in 1830, the complainant again proposed to the respondent, to take back the slaves, which was refused; as also a proposal to sign a defeasance, which the complanant wished to have executed. That the complainant then demanded the slaves and tendered the money; which was also refused.

The respondent denied all fraud, and insisted that a positive and absolute sale of the slaves was made, and not a mortgage; and exhibited, as part of his answer, a bill of sale, of the slaves in question, in the following words, to wit:

" The State of Alabama, Franklin County. Know all men, by these presents, that I have this day, bar⁻ gained and sold, unto Benjamin Hudson, of said County and State, four negroes, to wit: William, aged about twenty-six years; Aggy, aged twenty-four years; Malinda, aged eight years; and Harriet, aged six years—for, and in consideration of the sum of six hundred dollars, to me in hand paid. I do, hereby bind myself, my heirs, administrators, &c. to warrant and forever defend the right, title, and interest of said negroes. As witness, my hand and seal, this sixth day of October, 1827.

" Test. "ELLIS ISBELL. [Seal.]"

" James Davis."

A supplemental bill, filed in the cause, charged an intention, on the part of Hudson, to dispose of the slaves, and prayed an injunction, &c., which, after Hudson's answer and denial, was granted, and bonds executed.

Testimony in the cause.

*Daniel Williams* deposed, that he knew of the transaction alluded to in the bill and answers; that the value of the slaves delivered was about thirteen hundred dollars; that he understood, from the parties, that the sale or delivery of the slaves was conditional; that they were delivered to Hudson, in consideration of the payment by him of five hundred

dollars, or thereabouts, upon an execution in the hands of the coronor, and under which, a levy had been made upon the said slaves : that the condition of the contract was, that the slaves were to remain in Isbell's possession, until his crop of cotton, then on hand, was picked out; and, if he did not pay back the amount of money paid by Hudson, then the latter was to retain the slaves in his possession, until the money should be paid: that no certain time was agreed upon ; that witness was called upon by Hudson, to witness the agreement ; and that his understanding was, that Isbell had the privilege of redeeming the slaves at any time thereafter.

*Allen B. Hundley* deposed, that Hudson informed him, that he had paid something above five hundred dollars for Isbell; and that if said sum was refunded by a given time, the slaves, in question, were to be given up; otherwise the slaves were Hudson's: that Isbell had failed to redeem them, and he, Hudson considered them his own. That Hudson also admitted, that he was willing to allow Isbell the sum of one hundred and fifty dollars, in addition to the sum paid, and thus have the matter settled.

*Claiborn Williams* deposed, as to the value of the slaves : William he valued at about four hundred and fifty dollars ; Aggy, at three hundred dollars; Malinda, at two hundred and fifty dollars ; and Harriett, at two hundred dollars.

*William S. Hale* deposed, that in the fall of 1830, the complainant offered to pay, or tendered to Hudson, the money paid by Hudson for the complainant. That Hudson refused to receive the money—saying that he considered the slaves his own.

*Anderson Bean* deposed, that he knew of the levy upon the four slaves, William, Aggy, Malinda, and Harriet; and of their delivery to Hudson, upon the payment, by him, of five hundred dollars, or thereabouts: that the slaves were worth about twelve hundred dollars: that his understanding was, that Hudson paid the money for Isbell, on the condition that Isbell should be privileged to redeem; but in what time, witness did not know.

*Jahn M. Lewis* deposed, that he knew the slaves; that they were worth, at the time conveyed, about thirteen hundred and fifty, or fourteen hundred dollars: that Hudson told him, witness, that Isbell had reserved to himself the right to redeem the slaves, by refunding the money paid.

*Gregory D. Stone* deposed, that he heard Hudson say he had an absolute title to the slaves; that Isbell had failed to redeem them, and his, Hudson's, right to them was perfect and complete.

*Lewis Walden*, heard Hudson say, he had taken the slaves in question out of jail, by paying something above the sum of five hundred dollars; and that William was then working for the interest of the money.

*Richard S. Jones*, heard Hudson say, that Isbell had time to redeem the slaves; but that Isbell had failed to pay the money advanced for him. Heard a conversation between the parties, and then understood that Isbell had the privilege of redemption.

*William Davis* recollected that the slaves had been levied upon, and had been released by Hudson: but had the impression that Hudson purchased them.

5 s. & p.                        10

*Robert Thompson.*—Complainant in 1828, admitted to witness the levy upon the slaves, that he had procured the advance by Hudson, and said he had saved one out of the five slaves levied on, that he, complainant, said he would have been compelled to pawn the slaves, to get the money; and not thinking he could procure the money, he preferred Hudson to have them.

*Ann E. Thompson.*—In 1827–8, had a conversation with Isbell, concerning the slaves; that in reference to a conversation in which Hudson declared his wish, that Isbell would procure money, and take back the slaves,—she advised Isbell, who was her brother, to borrow the money and to do so, to which he answered, that he had no means of making the money; if he borrowed it, the negroes would have to be sold to pay the amount, and preferred that Hudson should have them, than any other person.

*James Davis* witnessed the bill of sale; the consideration of it, was that Hudson should release the slaves, from jail, on his own responsibility: that if the amount of the execution, (the payment of which was assumed by Hudson,) was refunded by complainant, at the term of a court then approaching, and a few weeks in advance, the bill of sale was to be cancelled, otherwise to become absolute.

The cause coming on to be heard on bill, answer, exhibits and testimony, it was ordered and decreed by the Chancellor that the slaves be given up by Hudson to complainant, and the latter recover for their detention the sum of two hundred dollars: from which decree Hudson took a writ of error.

*Stewart* for plaintiff in error.
*P. Martin, contra.*

TAYLOR, J. — The first position taken by the plaintiff in error, to reverse the decree of the Circuit Court, is, that parol evidence should not have been received, to vary the contract between the parties, from the one specified in the deed.

The deed purports to be a bill of sale for four slaves, from Isbell to Hudson. By the bill filed in this case, Isbell alleges that no sale of the slaves was actually made; but that they were mortgaged to secure the payment of a sum of money.

The answer of Hudson admits that there was not an absolute sale at the time the deed was executed, but insists there was a conditional one, and that it was intended between the parties, that it should be absolute, if he, (Hudson,) should have to advance the money, for which, he alleges, a judgment had been recovered on a note executed by Isbell, as principal, and himself, as security.

To sustain himself in the doctrine for which he contends, that is, that parol evidence can not be admitted, to prove a mortgage, when the deed expresses an absolute conveyance, the counsel for the plaintiff in error, has cited the case of *Thompson* vs *Patton.*[a] [a]5 Lit. 74.

The case certainly is full to the point, to support which it was cited. It is admitted, however, in the opinion, that the previous decisions in that State, had been different; and upon the examination of the books, I think it will be found, that that decision is not sustained by authority.

In *Ross* vs *Norvell,*[b] decided by the Court of Ap- [b]1 Wash, R 19.

peals of Virginia, it appeared that certain slaves had been conveyed by an absolute bill of sale, with a warranty, and a receipt for the consideration stated in the deed was indorsed on the back of it. A bill in Chancery was filed, to foreclose, alleging that, though the conveyance was absolute in form, it was intended as a security; and that it was verbally agreed at the time, that the plaintiff might redeem at any time, upon payment of the principal and interest. It was determined by the Court, that parol evidence was admissible, to prove that a mortgage was intended, although it was not pretended, that there was either fraud or mistake in the transaction; and a decree of foreclosure was the consequence.

*6 Johns. C. R. 432.*     In *James* vs *Johnson*,[a] Chancellor *Kent* says, "a deed, absolute upon its face, though taken as a mortgage, is certainly a lawful instrument, and the party is only subjected to the hazard of having it defeated, by a subsequent mortgage, duly registered."

It would appear from this extract, that the statutes of New York make some peculiar requisition, with respect to the registration of mortgages; for it is plainly intimated, that to register a bill of sale, as an absolute conveyance, when in truth it was intended as a mortgage, although expressed upon the face of the deed, as an absolute sale, might endanger the lien of the mortgagee, should there be a subsequent mortgage of the property: and the Chancellor says, that is the only hazard to which the party would be subject; thereby substantially declaring that the contract between the parties, would be enforced as a mortgage.

The same principle is sustained by the Supreme

Court of the United States, in the case of *Hughes* vs *Edwards*.[a] Justice *Washington*, in the opinion, deli- [a 9 Wheat. 489] vered in that case, said:  " The principles here laid down, are not less applicable to the case of an absolute deed, which is intended by the parties, to operate as a security for a debt, than they are to that of a common mortgage.   A Court of Equity looks at the real object and intention of the conveyances; and when the grantor applies to redeem, upon an allegation, that the deed was intended as a security for a debt, the Court treats it precisely as it would an ordinary mortgage, provided the truth of the allegation is made out by the evidence."

These authorities, it is believed fully show, that parol proof is admissible, to convert an instrument, which appears to be an absolute conveyance, upon its face, into a mortgage, by proving that the parties intended it to operate only as a security.

There was, therefore, no error, in the admission of the parol evidence by the Circuit Court.

The plaintiff in error next contends, that the contract between the parties, as proved by the evidence, was a conditional sale, not a mortgage.

The bill alleges that the contract was a mortgage, and that it was agreed, that the mortgagor might redeem, at any time during his life; but, if he did not do so, the mortgagee was to hold the property, discharged from the equity of redemption, on account of his wife being related to the mortgagor.

The answer alleges, that an execution had issued against Isbell which was levied upon the slaves in question; and another, that Hudson was sheriff of the county at the time; and that it was agreed be-

tween the parties that Hudson should release the
slaves upon Isbell's executing to him a bill of sale
for the four in controversy, for the purpose of " sav-
ing respondent harmless in the event he should have
to pay off the execution." It further alleges that
" this was done to save respondent, and to vest in
him the slaves absolutely, and not as a mortgagee, in
the event he had to pay off the *fi. fa.*; which was
obliged to be paid by the 5th November of the same
year; and that it was expressly agreed and underta-
ken by complainant, that he would pay off the *fi. fa.*
by the 5th November, but if he failed, then respon-
dent was to pay it, and hold the property absolutely."

The answer further alleges, that the judgment
was recovered, and the execution issued as well
against the respondent, who was security in the note
sued on, as the complainant. It is not proved, that
the respondent was a party to the judgment, and
the bill alleges that it had been rendered against the
complainant and one Thompson: this however, is
not material, further than its tendency to explain the
conduct of the sheriff, in agreeing to deliver up pro-
perty to a defendant, which had been taken by ex-
ecution.

In the depositions, taken in the cause, there is some
contrariety. The subscribing witness to the bill of
sale testifies, that he understood it to be a condition-
al sale; and that, if the execution were not discharg-
ed by Isbell, by the commencement of the next term
of the Court, to which it was returnable, Hudson
was to pay it off, and hold the slaves as his own.—
He says, however, that he was induced to believe
there was some other arrangement between the par-

ties, from some casual observations which dropped from them; but did not know what those arrangements were.

Daniel Williams deposes, that he was called upon by Hudson, to witness the contract; and that his understanding was, that Isbell was to be permitted to redeem at any time after the contract was made.

The witnesses, exclusive of those who speak of the subsequent declarations of Hudson, appear to be nearly equalised in number, as to the question of mortgage or conditional sale.

J. M. Lewis deposes, that Hudson expressly admitted to him, after he had paid the money and after the Court, to which the execution was returnable, that Isbell had a right to redeem; and others prove declarations of a similar kind.

The position taken by Hudson's counsel, that the testimony of the subscribing witness to the bill of sale, as to what transpired at the time of its execution, is to outweigh that of all other persons who were present at the time, cannot be maintained.— He is the best witness, as respects the execution of the instrument, which he has attested; for, to that fact, his attention must have been more immediately directed, than that of any other person; but the conversation, which passed at the time, might have been noticed by others, as much, or more than by him; and must have been attended to as particularly by Williams, who was called upon for the purpose : and this is especially the case here, when the subscribing witness declares there was some understanding between the parties, of which he was ignorant.

When, to other evidence is added the proof, made

by the witnesses on both sides, that the property was worth, and could then have been sold for more than double the sum it was conveyed to secure, a clear conviction is forced upon the mind, that a mortgage was intended by Isbell, even if it were understood differently by Hudson.

The delivery of the slaves into the possession of Hudson can not weigh much in the case, as it took place neither at the time the contract was made, nor at the time the money was paid. The answer states, that the contract was intended to save the respondent "harmless," and the possession of the property was the most effectual mode of effecting this object. In the case of *Conway's ex'r* vs *Alexander*,[a] the land had, for many years been in the possession of the vendee, but the mere circumstance, that possession passed at the execution of the deed, was not considered by the Court as material, in construing the contract. The length of time that had elapsed after the execution of the deed—the circumstance that possession, all that time, had been held, under the conveyance made by the trustees, and the valuable improvements which had been erected by the creditor, after he obtained possession—without any claim having been asserted by the debtor, during all that time, who lived in the immediate neighborhood, are dwelt upon, in the opinion, as going strongly to prove that a sale, and not a mortgage, was intended, especially when connected with the fact, that the money advanced, was not far from the full value of the land.

That it is competent for parties to make a conditional sale, can not be doubted, but from all the cir-

a 7 Cranch. 218

cumstances presented in the case, my opinion is, that a sale was not intended; and the very great inadequacy of the price, operates strongly, in bringing me to this conclusion.

As the complainant admits, in his bill, that Hudson was to have the use of the slaves, in lieu of interest on the money, and does not allege, that such contract was usurious, or otherwise illegal, the complainant should not be allowed hire, nor the respondent, interest, until the offer of the complainant, to redeem, by tendering the amount of the debt, as proved by the witness to the sale. From that time, say first of December, 1830, until the final decree, interest should be paid by Isbell, and a moderate hire by Hudson. This hire, under all the circumstances, should not exceed one hundred and twenty dollars per annum.

It does not appear upon what data the decree of the Circuit Court was rendered; but, from calculation, it would seem, that hire had been allowed to Isbell, from the time of the tender, without a deduction of the interest, which had accrued on the debt.

The decree is, therefore, reversed; and, in order that a final decree may be made, by the Circuit Court, conformable to this opinion, and finally settling the matters in controversy between the parties; and, that the plaintiff in error, (Hudson,) may be compelled to deliver up the slaves, the cause is remanded.

And, it is ordered and decreed, that the plaintiff

5 s & p.            11

in error recover the costs of this Court; and that the defendant in error recover the costs of the Circuit Court.

LIPSCOMB, C. J., not sitting.